USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 6/21/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL WALKER,

       Plaintiff,

–against–

COMMISSIONER JOSEPH PONTE, Department of Corrections, WARDEN LISA COOPER, Otis Bantum Correction Center, OTIS BANTUM CORRECTION CENTER, and CITY OF NEW YORK,

       Defendants.

**OPINION AND ORDER**

14 Civ. 8507 (ER)

Ramos, D.J.:

  Michael Walker ("Plaintiff" or "Walker"), appearing *pro se*, brings this action pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated as a pretrial detainee in the Otis Bantum Correctional Center ("OBCC") and the Brooklyn Detention Complex ("BKDC"). Plaintiff alleges that Commissioner Joseph Ponte ("Commissioner Ponte"), Warden Lisa Cooper ("Warden Cooper"), OBCC, and the City of New York (the "City," and collectively, "Defendants") violated his constitutional rights by subjecting him to strip searches and by forcing him to pass through a radiation-emitting x-ray screening machine called the RadPro SecurPass ("SecurPass"). Plaintiff seeks compensatory damages, punitive damages, injunctive relief, and a declaratory judgment that Defendants' acts and omissions violated his constitutional rights. Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 56 on the grounds that Walker cannot establish a § 1983 claim under the Eighth or Fourteenth Amendments as a matter of law. Doc. 60. For the reasons set forth below, Defendants' motion is GRANTED.

## I. FACTUAL BACKGROUND

The following facts are undisputed except where otherwise noted.[1]

### a. Walker's Custody and the SecurPass Machines

Walker was previously an inmate in the custody of the New York State Department of Corrections and Community Supervision (DOCCS) and the New York City Department of Correction (DOC) at the OBCC and BKDC. Defendants' Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("Defs.' 56.1") (Doc. 65) ¶ 2. According to the DOC's internal movement log, Walker was in the DOC's custody from February 15, 2013 to March 27, 2015. *Id.* ¶ 18. During this time period, Walker was held at OBCC or BKDC for a total of 466 days— 203 days at OBCC and 263 days at BKDC. *Id.* ¶¶ 19–20. BKDC never used the SecurPass machines; only the DOC facilities located at Rikers Island, including OBCC, used the SecurPass machines.

Walker alleges that he was repeatedly subjected to body scans without protective gear through the SecurPass machines. In his answers to Defendants' First Request for Production of

---

[1] Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). Each statement must be accompanied by a citation to admissible evidence. Local R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record to support or controvert a purported material fact). If a moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Rule 56.1. Local R. 56.2.

Defendant submitted a Local Rule 56.1 statement and provided Plaintiff with notice, pursuant to Local Rule 56.2, of the potential consequences of not responding to the motion. *See* Doc. 66. However, Plaintiff failed to submit a response to Defendant's Local Rule 56.1 statement or a counterstatement of his own; though his opposition contains factual assertions, it is largely comprised of his unsworn statements and argument, rather than citations to admissible evidence. As such, the Court may, but is not required to, conduct an independent review of the record. *See, e.g., Carbone v. Cnty. of Suffolk*, No. 10 Civ. 3631 (SJF), 2013 WL 1386251, at *5 (E.D.N.Y. Apr. 2, 2013) (discussing that "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." (quoting *Monahan v.. N.Y.C. Dept. of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000))).

Documents, Plaintiff maintains that he was scanned or exposed to radiation from the SecurPass "2–3 times a day, sometimes missing days." Defs.' 56.1 ¶ 14. Walker alleges that each examination subjected him to a level of radiation that is ten to fifty times higher than that emitted by the full-body scanners in use at airports. Pl.'s Mem. L. at 8. Plaintiff also alleges that the SecurPass caused him psychological injuries and mental anguish. *Id.*

In addition, Walker feared that he would be at a greater risk to the harmful effects of radiation exposure due to an open wound and the presence of small metal fragments in his chest. *See* Defs.' 56.1 ¶ 3. An entry from Walker's certified medical file maintained by the NYC Health and Hospitals Corporation ("HHC") confirms that on February 16, 2013, Walker was examined by a medical doctor who noted that Walker had an open wound in his chest as a result of a gunshot that he suffered on February 3, 2013. *Id.* ¶ 25. An entry from his medical file dated March 8, 2013 reflects that he visited the clinic at OBCC and the doctor noted that his wounds were "well healed." *Id.* ¶ 26. Additionally, an entry from his medical file dated December 26, 2014 notes that he underwent a thoracic spine x-ray and that "multiple metal fragments consistent with shrapnel" were located near his spine. *Id.* ¶ 28.

On April 1, 2014, Walker filed an inmate grievance with the DOC indicating that he believed the SecurPass machines were causing him harm, especially due to the bullet fragments in his chest. Doc. 69 at 17.

### b. Dr. P. Andrew Karam's SecurPass Radiological Findings and Conclusions

On June 19, 2014, at the request of the New York City Law Department, Dr. P. Andrew Karam traveled to Rikers Island to measure the radiation emitted by the SecurPass machines. *Id.* ¶ 44.[2] Dr. Karam is a board-certified health physicist (radiation safety professional) with over

---
[2] Dr. Karam was asked to examine the machines in connection with a series of similar lawsuits brought by inmates of Rikers Island, not necessarily in connection with Walker's suit specifically. Dr. Karam's testing of the SecurPass

35 years of experience in radiation safety. *Id.* ¶ 32. Dr. Karam has a Ph.D in environmental sciences from the Ohio State University and is the author of over 20 peer-reviewed scientific papers, along with several books and non-peer-reviewed technical presentations and publications. *Id.* ¶¶ 34, 36. Some of his notable work experience includes traveling to Japan following the Fukushima nuclear reactor accident at the request of the Tokushukai Medical Assistance Team and eight years of work in the US Naval nuclear power program. *Id.* ¶¶ 33, 37. Since January 2013, Dr. Karam has been employed by the New York City Police Department ("NYPD") as the Radiation Safety Officer and chemical, biological, radiological, nuclear, and explosives scientist at the NYPD's Counterterrorism Bureau. *Id.* ¶ 38.

Dr. Karam tested four SecurPass machines, each stationed within a different DOC facility on Rikers Island, including the machine located at OBCC on the date of his visit. *Id.* ¶ 45. Dr. Karam measured the absorbed radiation dose per scan using a calibrated Thermo Personal Radiation Detector (PRD) designed to measure low doses of radiation. *Id.* ¶ 46. He also made dose-rate measurements using a calibrated Bicron microREM meter. *Id.* According to Dr. Karam, use of these devices is a reliable and scientifically-accepted method for measuring low-level radiation doses. *Id.* The readings Dr. Karam obtained are summarized in the table below:

| Facility | Total radiation dose per scan (millirem) |
|---|---|
| OBCC | .014 |
| GMDC | .007 |
| GRVC | .012 |
| RNDC | .006 |

*Id.* ¶ 48.

---

machines for the consolidated actions and the instant case was the same. He conducted the testing on June 19, 2014, and obtained the test results from the same machines at Rikers Island. *See* Declaration of Dr. P. Andrew Karam in *In re Radpro SecurPass Scanner Cases* (13-cv-6095 (lead); 15-cv-2094) (Doc. 36).

Dr. Karam's testing results reflect consistently lower radiation dose rates than the per-scan dose of 0.025 millirem reported by the manufacturer of the SecurPass machine. *Id.* ¶ 49. Dr. Karam found no mechanism on the machines that would allow for an increase in the radiation emitted by the machines in order to increase the strength of the scans. *Id.* ¶ 50. Dr. Karam's conclusions can be summarized as follows:

- The lowest radiation exposure that has been shown to cause cataract formation is about 300 rem, or 300 million micro rem. *Id.* ¶ 51. This level of radiation exposure would require about 20 million exposures to the highest-dose device that Dr. Karam measured at Rikers Island's (which was located at the time of testing at OBCC). *Id.* ¶ 51.

- The lowest radiation exposure shown to cause a short-term biological effect (*i.e.*, radiation burns) to an isolated part of the body is in excess of 100 rem, or 100 million micro rem. *Id.* ¶ 52. This level of radiation exposure would require about 7 million exposures to the highest-dose device that Dr. Karam measured at Rikers Island. *Id.*

- The lowest radiation exposure shown to cause a short-term biological effect (*i.e.*, reduced blood cell counts) is approximately 25 rem, or 25 million micro rem, applied to the whole body. *Id.* ¶ 53. This level of radiation exposure would require about 1.8 million exposures to the highest-dose device that Dr. Karam measured at Rikers Island. *Id.*

- The lowest radiation exposure that has been shown to cause temporary sterility is about 15 rem, or 15 million micro rem. *Id.* ¶ 54. This level of radiation exposure would require about 1 million exposures to the highest-dose device that Dr. Karam measured at Rikers Island. *Id.*

- In order for radiation from the DOC's x-ray machines to cause tissue damage of any sort, the x-ray intensity would have to be enhanced by a factor of over 1 million. *Id.* ¶ 55.

- The risk of developing cancer from a given radiation exposure is about 5% for a dose of 100 rem (100 million micro rem), about 0.5% for a dose of 10 rem (10 million micro rem), and about 0.05% for a dose of 1 rem (1 million micro rem). *Id.* ¶ 57.

Dr. Karam concluded that the SecurPass machines that he examined do not emit harmful levels of radiation to those scanned, and pose between very little to no risk to those scanned, even if an individual is scanned or exposed to scattered radiation on two thousand separate occasions over the course of two years. *Id.* ¶ 62. According to Dr. Karam, the presence of an open or healing wound (including a gunshot wound) on a person's body or the presence of

multiple tiny metal fragments in a person's body does not change his opinion that the SecurPass machines used by DOC do not emit harmful levels of radiation to those scanned. *Id.* ¶ 64.

## II. PROCEDURAL BACKGROUND

Walker commenced this action on October 20, 2014. *See* Doc. 2. Defendants filed a Motion to Dismiss on February 24, 2015. Doc. 19. Walker was subsequently granted leave to file an Amended Complaint, which he filed on October 21, 2015. Doc. 29. Defendants filed their second Motion to Dismiss on January 11, 2016. Doc. 37; *see also* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs. Br.") (Doc. 39). On August 18, 2016, the Court granted Defendants' motion to dismiss in part, and denied it in part. Doc. 47. Specifically, the Court granted Defendants' motion to dismiss Walker's Fourth Amendment claim of illegal search and seizure resulting from strip searches and his Fourteenth Amendment claim of cruel and unusual punishment resulting from the strip searches. *Id.* at 7–11. The Court denied Defendants' motion to dismiss Walker's claim of cruel and unusual punishment resulting from the use of the SecurPass machines. *Id.* at 11–13. The Court also dismissed Otis Bantum Correctional Center as a Defendant because it lacked the capacity to be sued as merely an administrative arm of the City. Doc. 47 at 16.

A telephone conference with the parties and the Court was held on August 31, 2016. At this teleconference, Defendants' proposed, and the Court accepted, a recommendation that the parties proceed with limited discovery that focused on the potentially dispositive issue of whether the cumulative effect of the radiation had a risk of serious harm to Walker's health. Declaration of Carolyn Kruk ("Kruk Decl.") (Doc. 64) at Ex. A (Tr. 2:18–24; 4:8–14).

6

## III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal

quotation marks omitted). However, in opposing a motion for summary judgment, the nonmoving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation mark omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The Second Circuit has made clear that "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)). *Pro se* litigants' submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 6621, 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants). Although "pro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "However, a pro se party's 'bald assertion,' completely unsupported

8

by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. DISCUSSION

Defendants move for summary judgment on the grounds that Walker cannot establish a § 1983 claim under the Eighth or Fourteenth Amendments as a matter of law based upon his alleged exposure to radiation emitted by the SecurPass machine. Defendants argue that the SecurPass machine does not emit a harmful level of radiation, and that his open wound and the bullet fragments in his body do not alter this fact. Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem. L") (Doc. 61) at 2.

Section 1983 allows an individual to bring suit against persons who, acting under color of state law, have "depriv[ed him] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988). The statute "itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). A prison official's failure to protect a prisoner from harm may form the basis of a Section 1983 claim. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

The standards for establishing a constitutional violation under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment are identical in this context. *In re RadPro SecurPass Scanner Cases*, No. 13 Civ. 6095 (CS), 2014 WL 4054310, at *4 (S.D.N.Y. Aug. 13, 2014).[3] Prison officials are responsible for the safety of prison inmates; however,

---

[3] As opposed to deliberate indifference claims brought by post-conviction prisoners—which arise under the Eighth Amendment—claims for deliberate indifference brought by state pretrial detainees arise under the Fourteenth

"[not] every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for [the] prison officials [involved]." *Farmer*, 511 U.S. at 834. Rather, prison officials violate constitutional protections when two conditions are satisfied: (1) the alleged deprivation must, objectively speaking, be "sufficiently serious," and (2) the alleged perpetrator must possess a "sufficiently culpable state of mind." *Id.* (citations and internal quotation marks omitted). In the prison setting, "courts have defined this culpability as 'deliberate indifference' to the health and safety of inmates." *Randle v. Alexander*, 10 Civ. 9235 (JPO), 2013 WL 2358601, at *5 (S.D.N.Y. May 30, 2013) (citing *Farmer*, 511 U.S. at 834). Thus, this deliberate indifference standard is evaluated under a two-pronged test comprised of both objective and subjective components. *Jackson v. Goord*, 664 F. Supp. 2d 307, 315–16 (S.D.N.Y. 2009) (citing *Farmer*, 511 U.S. at 834).

The objective analysis of the seriousness of the conduct in question requires an examination of the alleged unconstitutional conditions. Under the objective prong of the deliberate indifference test, "the measure of a 'sufficiently serious' deprivation is 'contextual and responsive to contemporary standards of decency.'" *Jackson,* 664 F. Supp. 2d at 316 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). For a claim based on an inmate's exposure to a harmful substance, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. This inquiry "focuses on the danger posed by the material itself—that is, whether the nature and levels of plaintiff's exposure . . . [were] such as to pose 'an unreasonable risk' of serious damage to [his] health . . ." *Jackson,*

---

Amendment. *See Caiozzo v. Koreman*, 581 F.3d 63, 69–72 (2d Cir. 2009). Defendants analyze the issue under both the Eighth and Fourteenth Amendments and do not indicate whether Plaintiff was a pretrial detainee for the duration of the alleged conduct. Plaintiff, however, states in his opposition that he was a pretrial detainee during the alleged accidents. Pl.'s Mem. L. at 4. Because the same standards and analysis apply here, it is immaterial to the Court's analysis whether Plaintiff was a pretrial detainee for the duration of the alleged events.

664 F. Supp. 2d at 316 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). "Inmates therefore do not have an unqualified constitutional right to an environment free of all harmful substances, but only a right to be free of involuntary exposure to a level of such substances which unreasonably endangers their future health." *In re RadPro SecurPass Scanner Cases*, 2014 WL 4054310, at *5. In determining whether a risk of harm is unreasonable, a court must assess whether the risk is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling,* 509 U.S. at 36 (emphasis in original). Thus, to satisfy the objective element and survive summary judgment, Walker must provide some evidence to show that his conditions of incarceration related to the SecurPass machine pose a substantial risk of serious harm.

Under the subjective element, a prisoner can recover only if the injury was a product of the prison official's "purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d. Cir. 1997) (quoting *Farmer*, 511 U.S. at 834). An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (citations and internal quotation marks omitted).

Here, based on the Court's grant of limited discovery, Defendants challenge whether Walker has met the objective standard for deliberate indifference based on the levels of radiation emitted from the SecurPass x-ray machines. In opposition to Defendants' motion, Walker filed a brief and attached various exhibits consisting of: (1) the declarations of six inmates at OBCC

who complain about "degrading strip searches" and that they are afraid that the SecurPass machines are causing them harm; (2) three inmate grievance forms, including Plaintiff's own, wherein they claim that the SecurPass is doing them harm; (3) an internet article titled "Strip search policies in jails" dated January 27, 2011; (4) a DOC "Report and Notice of Infraction" detailing a November 16, 2013 incident wherein Plaintiff was "refusing to step out of the DOC vehicle" and a struggle with members of an Extraction Team ensued; (5) excerpts from Plaintiff's Bellevue Hospital Center medical records that document "testicle trauma" that Plaintiff alleges was caused when "a correction officer grabbed him by the testicles and threw him to the ground" and the presence of metal fragments in his chest consistent with his prior gunshot injury; and (6) pages from his Rikers Island medical records dated November 19, 2013 documenting Plaintiff's complaint of "left testicular swelling" and tenderness. *See* Pl.'s Mem. L.

However, the Court finds that Walker's opposition contains only conclusory assertions that are unsupported by evidence as it relates to the potential harm posed by the use of the SecurPass machines, including to those with open wounds or metal fragments in their bodies. Walker claims, without further support, that "[i]t's a given that radiation causes effects to the human body." *Id.* at 6. He also argues, without pointing to any supporting evidence, that "[t]o be exposed to emissions of radiation while still 'fresh' on recovery of a few gunshot wounds . . . [m]akes for an unusual situation of risk of exposure." *Id.* "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee*, 902 F. Supp. at 429 (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Walker alleges that the SecurPass machine causes a variety of physical complications such as cataract damage, sterilization, and cancer, as well as emotional injuries stemming from

12

fears of the physical risks. *See* Defs.' 56.1 ¶ 4. Walker cites a propublica.org article and a National Academy of Sciences study for the proposition that radiation exposure from an x-ray device could cause DNA and genetic mutations, and potentially cancer. Pl.'s Mem. L. at 8.[4] Both parties acknowledge that radiation exposure can potentially cause significant health effects, including cancer; the issue here is not whether radiation in general can cause cancer, but instead whether the nature, severity, and frequency of radiation that Walker was exposed to was such as to pose "an unreasonable risk" of serious damage to [his] health." *Jackson*, 664 F. Supp. 2d at 316. "[W]hile exposure to any amount of radiation poses some risk of harm—society chooses to, and indeed must, tolerate some level of radiation exposure." *In re RadPro SecurPass Scanner Cases*, 2014 WL 4054310, at *6.

     Plaintiff alleges that he was required to pass through the SecurPass machines routinely and that each examination subjected him to a level of radiation that is ten to fifty times higher than that emitted by the full-body scanners in use at airports. Pl.'s Mem. L. at 8. Walker stated in his answers to Defendants' First Request for Production of Documents that he was scanned or exposed to radiation from the SecurPass "2–3 times a day, sometimes missing days." Doc. 55 at 2. Thus, assuming conservatively that he was required to pass through the SecurPass machine three times daily for the entirety of the 203 days he was in held at OBCC and BKDC (even though Defendants state BKDC did not require inmates to be scanned with the SecurPass machines), Walker would have been exposed to radiation from the SecurPass a maximum of

---

[4] While Walker does not attach the article as an exhibit to his papers, the Court was able to find the article at the web address listed, http://www.propublica.org/ar ticle/drive-by-scanning-officials-expand-use-anddose-of-radiation-for-security-s.

1,398 times.[5]  Dr. Karam determined that "Plaintiff would need to be scanned over 700,000 times by the highest dosage machine measured" (which, at the time was at OBCC) "in order to be exposed to a level of radiation that even minimally (.5%) increased his risk of developing fatal cancer."  Defs.' 56.1 ¶ 60.  To be sure, Walker was subjected to the SecurPass machine substantially fewer times.

Walker raises several objections to Dr. Karam's testing of the SecurPass machines at Rikers Island, including that Dr. Karam has no knowledge of the specific scanners that were actually used to screen Walker.  Pl.'s Mem. L. at 7.  That is, Dr. Karam only tested the four SecurPass machines located at four facilities on Rikers Island, including OBCC, on June 19, 2014.  Defs.' 56.1 ¶ 44–45.  Neither party has provided any information concerning whether the machines Dr. Karam tested included the specific machines that were used to scan Walker during his tenure at Rikers Island.  While this critique of Dr. Karam's testing has some logical force, it does not overcome the fact that Walker's assertions about the risk involved are purely conclusory.

Walker also suggests, without reference to any admissible evidence, that it was possible that the SecurPass operators could manually raise the level of radiation exposure emitted as he passed through the machine.  Pl.'s Mem. L. at 6.  He states that the level of radiation an inmate receives it as the "discretion of the operator."  *Id.* at 8.  In examining the SecurPass machines however, Dr. Karam found no mechanism that would allow the operator to increase the radiation emitted in order to increase the strength of the scan.  Defs.' 56.1 ¶ 50.  Walker's conclusory allegation that prison officials could manually adjust the level of radiation is thus insufficient.

---

[5] If he was scanned three times daily at OBCC, a facility that used the machines, he would have been scanned 609 times.

14

None of Walker's arguments suggest that the amount of radiation emitted by the SecurPass comes even remotely close to constituting a risk so grave that it violates "contemporary standards of decency." *Jackson*, 664 F. Supp. 2d at 316. Walker further argues that the bullet fragments in his body and the open wound he suffered from temporarily heightened the effects of the radiation emitted from the SecurPass machines. On the contrary, Dr. Karam concluded that the machines he examined pose between very little to no risk to those scanned, even if an individual has an open wound or bullet fragments in his body. Declaration of Dr. P. Andrew Karam, (Doc. 62) ¶¶ 42–43. Additionally, Walker's general allegations of mental anguish caused by the SecurPass do not implicate the objective prong without more. *See, e.g., Torres v. Aramark Food,* No. 14 Civ. 7498 (KMK), 2015 WL 9077472, at *8 (S.D.N.Y. Dec. 16, 2015) (listing cases).

Judge Seibel's order granting summary judgment in favor of defendants in *In re RadPro SecurPass Scanner Cases* is instructive here. *See* 13-cv-6095 (CS) (Doc. 181). In that consolidated action, plaintiffs were inmates or former inmates at facilities run by DOC and alleged that they were exposed harmful levels of radiation emitted by SecurPass. As here, the court ordered a period of limited discovery solely on the potentially dispositive issue of whether the cumulative effect of regular SecurPass scans presents a substantial risk of serious harm to an inmate's future health. *Id.* at 1. In that matter, as here, defendants offered the declaration of Dr. Karam stating, among other things, that he measured the radiation dose emitted by SecurPass machines located at Rikers Island and that the radiation dose per scan for each of those machines was 0.014, 0.007, 0.012, and 0.006 millirem, respectively. *Id.* at 7. The Court accepted his findings and conservatively estimated that one plaintiff was scanned at most 852 times and that the accompanying radiation dosage was only a tiny fraction of the lowest radiation dose shown

to have measurable long-term impact. *Id.* at 9–10. The court reasoned that the amount of SecurPass radiation that the inmate would have absorbed in total was still less than the amount absorbed during a single mammogram or the annual amount of additional radiation absorbed by someone living in Denver versus a community at sea level. *Id*.

The Court finds no genuine factual dispute exists as to whether the SecurePass presents a substantial risk of serious harm to Walker's future health. Thus, Walker has failed to satisfy the objective element of the deliberate indifference standard. Therefore, the Court need not consider the subjective element. Because Walker has offered no credible evidence in support of his claim that the SecurPass emits a harmful level of radiation, summary judgment is appropriate on Walker's § 1983 claim.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. Walker's remaining claim arising under § 1983 and his Amended Complaint, Doc. 29, is therefore dismissed.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 60, close the case, and mail a copy of this order to Plaintiff.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444–45 (1962) (holding that appellant demonstrates good faith when seeking review of a nonfrivolous issue).

It is SO ORDERED.

Dated: June 21, 2017
New York, New York

Edgardo Ramos, U.S.D.J.